| | | |
|---|---|---|
| RICHEY A. HARE, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 C 3973 |
| | ) | |
| JOHN ZITEK, individually and in his | ) | |
| official capacity as Chief of | ) | |
| Police of the Stickney Police | ) | Magistrate Judge |
| Department, THE VILLAGE OF STICKNEY | ) | Arlander Keys |
| POLICE DEPARTMENT, DONALD TABOR, | ) | |
| individually and in his official | ) | |
| capacity as President of the | ) | |
| Village of Stickney, and THE | ) | |
| VILLAGE OF STICKNEY, a municipal | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Richey Hare joined the Stickney Police Department in 1986.
In 2002, he sued the department, as well as the Village of
Stickney, Stickney's Chief of Police (John Zitek), and Stickney's
Mayor (Donald Tabor), alleging that these defendants retaliated
against him because he uncovered and exposed corruption within
the Police Department and within the Village. Specifically, he
claims that the defendants harassed and intimidated him, going so
far as to attempt to trump up a sexual assault case against him,
all in violation of 42 U.S.C. §1983, and in furtherance of a
conspiracy to violate 42 U.S.C. §1983. The case is before the
Court on a motion for summary judgment filed by the defendants.

## **Factual Background**

A.   Richey Hare, John Zitek &
     the Stickney Police Department

Richey Hare has served as a member of the Stickney Police Department since 1986. (Hare Dep. 6/13/03 pp. 59, 70). He served initially as an auxiliary or reserve police officer, was promoted up through the ranks, and eventually attained the rank of Lieutenant. (Hare Dep. 6/13/03 pp. 59, 70). In May of 1999, he became "Commander" when the previous Commander died suddenly; the Commander position, which is sometimes referred to as the "Chief of Detectives" and was, at that time, second in command only to the Chief, was created under John Zitek, who has served as Stickney's Chief of Police since June 1993. (Hare Dep. 6/13/03 pp. 70-72; Zitek Dep. 6/23/04 pp. 5, 17, 27-28, 65-67; Plaintiff's Exhibit 10 - Rules and Regulations of Stickney Police Department, Table of Organization).[1]

Chief Zitek recommended that Mr. Hare be promoted to the Commander post because, in his view, Mr. Hare was "a very good officer," he was "competent" and "bright." (Zitek Deposition p. 68). Despite this endorsement, it is clear that there is no love

---

[1]According to the provisions of the Village Municipal Code, the person performing the duties of Commander would retain his regular rank, and revert to that rank when his term as Commander ended, as determined by the Chief of  Police with the advice and consent of the Village Mayor and the Board of Trustees. (Plaintiff's exhibit 12 - Excerpts from Stickney Municipal Code §18-2.1. Commander).

2

lost between Chief Zitek and Mr. Hare. The parties agree that the relationship between the two was, at least after Mr. Hare became Commander, frosty. And both parties agree that, to the extent it was intact at the time, the relationship between Mr. Hare and Chief Zitek totally broke down on July 17, 2000.

## B. The Heather Hanlon Incident

That day, Mr. Hare returned to work after a vacation and learned that Heather Hanlon, a radio dispatcher who had been hired by Chief Zitek in 1997, had forged his computer signature to run a criminal background check through the National Crime Information Center. (Hare Dep. 8/13/03 p. 198; Hanlon Dep. p. 8). When Mr. Hare confirmed that Ms. Hanlon had used his name for a criminal background check, he reported her conduct to Chief Zitek and requested Ms. Hanlon's resignation, as well as a letter from Ms. Hanlon stating that she used Mr. Hare's name to run a background check without his authorization. (Hare Dep. 8/13/03 pp. 204-205). According to Mr. Hare, Chief Zitek initially agreed with him. (Hare Dep. 8/13/03 p. 205). Mr. Hare then called Ms. Hanlon at her house and asked for her letter of resignation, which she brought to the Police Department within an hour. (Hare Dep. pp. 205-207).

Mr. Hare then made a copy of Ms. Hanlon's letter and brought it to Chief Zitek's office. (Hare Dep. 8/13/03 p. 211). At that

time, Chief Zitek advised Mr. Hare that he had decided not to fire Ms. Hanlon, but that he had decided instead to suspend her for two months. (Hare Dep. 8/13/03 p. 212). Mr. Hare replied that he already had her letter of resignation and that he was not willing to accept any lesser punishment for her than that. (Hare Dep. pp. 8/13/03 pp. 212-213). Mr. Hare maintained that if Ms. Hanlon did not resign, the only other alternative would be to prosecute her criminally, because her conduct constituted a felony. (Hare Dep. 8/13/03 pp. 213-214). Mr. Hare and Chief Zitek continued to argue about whether Mr. Hare would be able to bring criminal charges. (Hare Dep. 8/13/03 214-217). Finally, according to Mr. Hare's testimony, Chief Zitek stated that the only way Ms. Hanlon was going to jail was if Chief Zitek went with her, and Mr. Hare replied that if Chief Zitek would obstruct her arrest, he would have to go to jail as well. (Hare Dep. 8/13/03 pp. 217, 223). Mr. Hare testified that, at that point, Chief Zitek said that he was going to report Mr. Hare to the Mayor, and he stormed out of the office. (Hare Dep. 8/13/03 p. 223). After Chief Zitek, Mr. Hare left the police station. (Hare Dep. 8/13/03 pp. 223-224). Mr. Hare testified that both he and Chief Zitek were speaking loudly during the conversation, with the door to Chief Zitek's office open, so that many people could hear them arguing. (Hare Dep. 8/13/03 p. 217-218).

Up to the point where they both left the Chief's office, the testimony of Mr. Hare and Chief Zitek is substantially the same. Their testimony diverges substantially, however, about how the events unfolded after that point.

According to Mr. Hare, after he left, Chief Zitek paged him and ordered him to return to the station. (Hare Dep. 8/13/03 p. 290). Mr. Hare went to Chief Zitek's office, where he found not only Chief Zitek, but also Donald Tabor, who has served as the Mayor of the Village of Stickney since 1999, and James Dolezal, who was once Stickney's Chief of Police and who now serves as a Village Trustee and the Chairman of the Board of Trustees' Police Committee. (Hare Dep. 8/13/03 pp. 290-291; Tabor Dep. 7/23/04 pp. 14-15; Dolezal Dep. pp. 10-12, 14). Mr. Hare testified that, when he walked into the office, Chief Zitek started screaming that he was the Chief of Police, while Mr. Hare was nobody, and that if Mr. Hare did not like how Chief Zitek ran his department, he could leave. (Hare Dep. 8/13/03 pp. 292, 295-296). The meeting then ended. (Hare Dep. 8/13/03 p. 296).

Chief Zitek's recollection of the conversation is different. Chief Zitek testified that Mr. Hare threatened to arrest him, that Mr. Hare was angry, proclaiming that he, not Chief Zitek, should be the Chief of Police and that Chief Zitek was a Chicago cop who did not belong at the Stickney Police Department. (Zitek

5

Dep. 6/23/04 p. 137, 127-128). Chief Zitek testified that Mr. Hare "lost it," and "went totally ape, totally nuts"; he testified that Mr. Hare called him "all sorts of names," and told him that he would use his connections with Trustee Dolezal to remove the Chief from office and take over his job. (Zitek Dep. 6/23/04 pp. 127-128). Chief Zitek testified that Mr. Hare had never spoken to him in this manner before. (Zitek Dep. 6/23/05 p. 133). Mr. Hare denies Chief Zitek's assertion about what happened during the July 17 meeting. (Hare Dep. 4/28/04 pp. 222-223).

Trustee Dolezal, who confirmed that he was present during this meeting, would seem to side with Mr. Hare: he testified that Mr. Hare was respectful and used the word "sir" when referring to Chief Zitek, and he testified that Mr. Hare never said he wanted to be Chief or that he wanted to get rid of Chief Zitek. (Dolezal Dep. pp. 46, 70-71). Mayor Tabor similarly confirmed that he was present during this meeting, and he similarly testified that Mr. Hare referred to Chief Zitek as "sir" throughout the encounter. (Tabor Dep. 1/26/05 p. 27). On the other hand, Mayor Tabor also testified that Mr. Hare told Chief Zitek that he was after Chief Zitek's job. (Tabor Dep. 1/26/05 pp. 27).

Mr. Hare testified that, after the meeting, he returned to

6

his office and spoke with the Mayor about certain improprieties within the police department that he and some other police officers were concerned about. (Hare Dep. 8/13/03 p. 299, 301-306). According to Mr. Hare, Mayor Tabor responded that he would look into the issues, but that the incident involving Heather Hanlon was over, that he would accept Ms. Hanlon's resignation. (Hare Dep. 8/13/03 p. 306).

Mr. Hare testified that, after talking with Mayor Tabor — both about the Heather Hanlon incident and about his perceptions of corruption in the department, he called an attorney who had helped him out in the past to report the events that had just transpired; he testified that he contacted the attorney because he "knew that Chief Zitek was going to come after me for what had just happened]." (Hare Dep. 8/18/03 p. 260).

C.  Mr. Hare's Allegations of
    Corruption in Chief Zitek's Department

In their motion for summary judgment, the defendants focus primarily on the Heather Hanlon incident. They argue that, to the extent Mr. Hare was treated badly by Chief Zitek or by the Village, that mistreatment was a result of animosity created because of the Heather Hanlon incident. Mr. Hare argues otherwise; in his view, the story begins not in July 2000 when the Heather Hanlon incident occurred, but in May of 1999.

7

According to Mr. Hare, this case really begins shortly after Chief Zitek appointed him to the post of Commander. At that time, Mr. Hare assumed, among other responsibilities, the responsibility to maintain and control the police department's evidence room. (Hare Dep. 6/13/03 pp. 73-74). In that capacity, upon assuming the role of commander, Mr. Hare immediately performed a preliminary audit of the room. (Hare Dep. 6/13/03 p. 78). At his deposition, Mr. Hare testified that he found irregularities, such as unmarked evidence, evidence of a suspicious nature, and lack of uniformity. (Hare Dep. 6/13/03 p. 77). Mr. Hare also testified that, when he reported to Chief Zitek that he found discrepancies, Chief Zitek laughed and told Mr. Hare not to worry about it, that it was over, and that "it lies with the dead man" - presumably meaning the previous Commander who had died and whose post Mr. Hare had assumed. (Hare Dep. 6/13/03 p. 91). Mr. Hare testified that he wanted to bring in the Illinois State Police for an independent audit, but that Chief Zitek ordered him not to. (Hare Dep. 6/13/03 p. 99-100).

After Mr. Hare conducted his preliminary audit, he attended a one week Property and Evidence Management course at the Naperville Police Department. (Hare Dep. 6/13/03 p.107; Plaintiff's Exhibit 18, Evidence Room Discrepancies). Mr. Hare

testified that, after the course, he again spoke with Chief Zitek about bringing in an outside agency for an independent audit, an idea Chief Zitek again shot down. (Hare Dep. 6/13/03 p. 111). Mr. Hare testified that Chief Zitek repeated that the issue was over and that it "lies with the dead man." (Hare Dep. 6/13/03 p. 110-111). Mr. Hare testified that he and Captain Elias, a fellow officer, then conducted a complete audit and determined that: evidence was in a state of disarray; some evidence was missing, including a kilo of cocaine, some silver and gold coins, and other money; a lot of evidence was unaccounted for; and they had "no idea what half of the stuff was." (Hare Dep. 6/13/03 pp. 119-122). Various officers, including Sergeant Philippon, Jeffrey Walik, and Joseph Kretch, testified that Mr. Hare and Captain Elias discussed with them the missing evidence. (Philippon Dep. p. 33; Walik Dep. p.11; Kretch Dep. p. 196).

Chief Zitek's testimony, on the other hand, differs substantially from Mr. Hare's on the point of the evidence locker. In his deposition, Chief Zitek denied that he ever refused Mr. Hare's request to bring in an outside agency. (Zitek Dep. 6/23/04 p. 77). In fact, he testified that, after the final audit, Mr. Hare reported to him that everything was perfect and there was nothing wrong. (Zitek Dep. 6/23/04 p. 73).

Beyond the evidence locker irregularities, Mr. Hare also

9

testified that he and fellow police officers suspected that criminal activity was happening at the Police Department because large amounts of money that previously went to the Treasurer's Office were now going through Chief Zitek. (Hare Dep. 8/13/03 p. 288). The officers suspected that Chief Zitek misappropriated money received by the Police Department through parking tickets, bail postings, prostitution stings, etc. (Philippon Dep. p. 9; Walik Dep. p. 7). In fact, officer Walik testified that, on several occasions, he saw Chief Zitek open parking ticket envelopes and remove the cash out of them, commenting that he needed money to take his wife out for dinner. (Walik Dep. pp. 8-9).

Mr. Hare also testified that he saw Chief Zitek open envelopes containing money for parking violations, fines, and bonds, and put the cash he took out of the envelopes into his desk drawer. (Hare Dep. 8/13/03 pp. 246-247). Similarly, Dora Madsen, the Village Treasurer, testified that, on several occasions, she witnessed Chief Zitek take cash from parking ticket funds and put it in his pockets. (Madsen Dep. p. 78).

The officers also testified that they were concerned that Chief Zitek kept part of the money that the Village received for off duty details performed by the police officers. Before Chief Zitek changed the policy, police officers were paid by a check

10

from the Village for working off duty details on special events. (Hare Dep. 6/13/03 p. 186). Chief Zitek started the practice of paying officers in cash. (Hare Dep. 6/13/03 p. 186). Chief Zitek admitted that officers were sometimes paid in cash for their off duty details; he also admitted that he did not know whether taxes were withheld from officers who received such cash payments. (Zitek Dep. 6/25/04 p. 282). Officer Figueroa testified that he discovered that Chief Zitek received compensation for the Laramie Fire Watch detail, where police officers watch the garbage dump, even though he was not aware that Chief Zitek ever worked that detail. (Figueroa Dep. p. 10-12, 16, 18). Mr. Hare testified that, on at least two occasions, Chief Zitek endorsed checks issued to the Village of Stickney as payments for off duty details, ordered Mr. Hare to cash the checks at a bank, through a personal friend of his, and then took the cash from the checks, paying the officers who worked those events in cash. (Plaintiff's Exhibit 20: Hare Cook County Grand Jury Testimony, pp. 24-31). Mr. Hare testified that part of the cashed checks included reimbursements to the Village for use of its squad cars, and that the entire amount of the checks was supposed to be processed through the Village. (Plaintiff's Exhibit 20: Hare Cook County Grand Jury Testimony p. 30).

Mr. Hare, Officers Walik and Kretch, Sergeant Philippon and

11

Captain Elias met several times to discuss their suspicions of corruption at the Police Department. (Hare Dep. 8/13/03 p. 235). Mr. Hare testified that he first met with an attorney to discuss these suspicions as early as July 5, 2000. (Hare Dep. 8/13/03 p. 231). However, Mr. Hare also testified that, because Chief Zitek instituted a policy prohibiting police officers from speaking with Village officials, he did not report the alleged misconduct to Mayor Tabor until July 17, 2000, after the altercation involving the Heather Hanlon incident. (Hare Dep. 8/13/03 p. 301).

The evidence shows that, even before the Heather Hanlon incident, Mr. Hare met several times with other police officers to discuss their suspicions of corruption at the Police Department. (Hare Dep. 8/13/03 p. 253). The officers also shared their suspicions with various attorneys. (Hare Dep. 8/13/03 p. 235). At the time, the officers were unsure what agency was the appropriate body to investigate the alleged improprieties at the Police Department. (Hare Dep. 8/13/03 p. 231).

D.    The State's Attorney & The Grand Jury

On August 16, 2000, Mr. Hare and other members of the Stickney Police Department – namely, Sergeant Philippon, Officer Kretch and Officer Walik – finally met with the Cook County

12

State's Attorney's Office ("SAO") to report their suspicions. (Hare Dep. 8/13/05 p. 258; Philippon Dep. p. 8, 23; Kretch Dep. p. 13). At the time, Chief Zitek was the main subject of the officers' complaint. (Kretch Dep. p. 147; Philippon Dep. pp. 10, 22).

Sometime around October of 2000, the SAO started a grand jury investigation of the Police Department. (Stratton Dep. 11/19/03 p. 11). Karyn Stratton, a 19-year veteran with the Public Integrity Unit, was assigned to the case. (Stratton Dep. 11/19/03 p. 7). Ms. Stratton testified that her investigation revealed some evidence of Chief Zitek's misconduct to support the officers' allegations. (Stratton Dep. 11/19/03 p. 61). As a result of the grand jury investigation, Ms. Stratton uncovered theft at the Police Department in excess of $200,000. (Stratton Dep. p. 120). Ms. Stratton testified that the missing money consisted of cash taken from bonds, police fines, prostitution stings, etc. (Stratton Dep. p. 120). According to Ms. Stratton's testimony, she did not indict Chief Zitek, because, even though she believed he had stolen money from the department, given her experience with the Village, the Village would hinder her investigation, and she would ultimately be unable to prove Chief Zitek's corruption and theft beyond a reasonable doubt. (Stratton Dep. pp. 136-137).

13

It is clear that, at some point, Chief Zitek and the other Village officials learned about the SAO's investigation. But the parties disagree on when they learned about it and when they learned that Mr. Hare was involved with it. The defendants argue that "there is no testimony or other evidence" that Chief Zitek knew that Mr. Hare was one of the "whistleblowers." (Defendant's SOF ¶118). Mr. Hare, on the other hand, points to certain portions of deposition transcripts that suggest that Chief Zitek knew, from the early stages of the SAO investigation, that Mr. Hare was one of the "whistleblowers." (Plaintiff's Response to ¶118 of Defendants' SOF).

For example, Mr. Hare testified that, on October 18, 2000, he met with Trustee Dolezal and informed him about the SAO's investigation of the Police Department. (Hare Dep. 4/28/04 pp. 213-214). Trustee Dolezal testified that, after his conversation with Mr. Hare, he went to the Village Treasurer, Dora Madsen, and informed her that the SAO was conducting an investigation, in which she should cooperate, and that Chief Zitek was the target of the investigation. (Dolezal Dep. p. 33). Trustee Dolezal also testified that he might have reported to Mayor Tabor that Mr. Hare had gone to the SAO. (Dolezal Dep. p. 65).

Additionally, when Ms. Stratton interviewed Ms. Madsen at the Police Department in October 2000, Mayor Tabor and Chief

14

Zitek told her that they had the right to know what the interview was about. (Stratton Dep. 11/19/03 pp. 107-108). According to Ms. Stratton, Chief Zitek told her that he knew about the investigation, because one of his friends received a subpoena. (Stratton Dep. 11/19/03 p. 107; 12/13/04 p. 83). Ms. Madsen testified that, after Ms. Stratton interviewed her, Ms. Madsen informed Mayor Tabor and the trustees at the Village what the conversation was about. (Madsen Dep. p. 18).

Mayor Tabor, on the other hand, testified that, while he found out about the investigation the day Ms. Stratton came to interview Ms. Madsen, he learned about *the nature of the investigation* only several months later, from Trustee Dolezal. (Tabor Dep. 7/23/04 pp. 45, 48). Mayor Tabor also denies that he asked Ms. Stratton anything about the investigation or the individuals involved. (Tabor Dep. 7/23/04 pp. 47-48).

Mr. Hare testified that, on or about November 10, 2000, he received a telephone call from Robert Rivkin, an attorney who was working for the Village. (Hare Affidavit ¶ 13). Mr. Hare testified that Mr. Rivkin told him that he was an attorney retained by the Village regarding the corruption investigation, and that he wanted to meet with Mr. Hare to learn the basis of Mr. Hare's knowledge about the allegations of corruption. (Hare Affidavit ¶ 14). Mr. Hare informed Mr. Rivkin about his grand

15

jury testimony and the knowledge he had of corrupt practices. (Hare Affidavit ¶¶ 15-18). On November 28, Mr. Hare had a second meeting with Mr. Rivkin at the Village Hall, where Mr. Rivkin advised him that he had told Mayor Tabor and the Village Trustees about Mr. Hare's allegations of corruption. (Hare Affidavit ¶¶ 19-20).

Donald Kreger, the main attorney for the Village of Stickney, testified that Robert Rivkin was asked by Mayor Tabor on behalf of the Village to conduct an investigation into allegations of corrupt practices by Village personnel. (Kreger Affidavit ¶¶ 2-3). Mr. Kreger also testified that Mr. Rivkin communicated the results of his investigation to various Village officials. (Kreger Affidavit ¶ 3).

Meanwhile, the subject of corruption at the Stickney Police Department was picked up by a local newspaper. Susan Locander, a freelance reporter, authored an article entitled *Kreger: Stickney Won't Punish the "Whistleblower"* published on March 28, 2001. (Locander Dep. pp. 5-6, 30; Plaintiff's Exhibit 42 - 2 newspaper articles written by Ms. Locander about the Police Department investigation). Ms. Locander testified that she remembered Mayor Tabor saying that Mr. Rivkin told him about the officers' concerns in October 2001. (Locander Dep. pp. 27, 30). Ms. Locander also wrote in her article that the Village had received

16

anonymous tips about the identities of the whistleblowers around
the time the SAO investigation started. (Locander Dep. p. 33;
Plaintiff's Exhibit 42).

E.   Mr. Hare's Allegations of
     Retaliation, Intimidation & Harassment

In his complaint, Mr. Hare asserts that he was a victim of
retaliation as a result of his speaking out to the SAO about his
suspicions of corruption at the Stickney Police Department.
(First Amended Complaint, ¶ 40). Some of the alleged acts of
retaliation include the Village's failure to provide him with
legal representation during grand jury proceedings, changes in
duties and responsibilities, the initiation of criminal charges
against Mr. Hare, the pursuit of the petition to revoke Mr.
Hare's firearm license, and the interference with the Stickney
Police Pension Board hearings and operations to prevent and later
to reverse Mr. Hare's line of duty disability. (First Amended
Complaint ¶ 42). The Court will discuss the details of these
allegations below.

Mr. Hare first claims that the Village retaliated against
him by failing to provide him with legal representation during
the grand jury testimony. On October 25, 2000, grand jury
subpoenas were issued for the testimony of Mr. Hare and several
other officers. (Plaintiff's exhibit 19 - Cook County Grand Jury

Subpoenas). Mr. Hare alleges that before their grand jury testimony, the Village offered subpoenaed officers legal representation, but that he – unlike the others – received no such offer. (Plaintiff's memorandum in opposition to the motion for summary judgment, p. 18). For example, Mayor Tabor called Officer Fox to inform him that the Village would provide him with a lawyer (Fox Dep. pp. 45-46); Chief Zitek called Mark Kozelka and referred him to Mayor Tabor to discuss his legal representation (Kozelka Dep. pp. 11, 13). Mr. Hare testified that nobody from the Police Department called him or paged him after the Department received his subpoena. (Hare Dep. 4/28/04 p. 126).

Mr. Hare also claims that his duties and responsibilities were significantly changed after his grand jury testimony. Mr. Hare testified that, on or about December 1, 2000, Chief Zitek transferred him from the Detective Unit to the position of watch commander and reassigned him to patrol duties. (Hare Affidavit ¶ 11). Before the transfer, Mr. Hare worked regular shifts from 8 a.m. until 4 p.m., with weekends and holidays off and almost unlimited overtime opportunities. (Hare Affidavit ¶¶ 8-9; Plaintiff's Exhibit 14 - Chief Zitek's memo assigning Mr. Hare to the 8-4 shift Monday through Friday). Mr. Hare also testified that, prior to December 1, 2000, he was provided with an

18

unmarked, take-home police car, which he drove 24 hours a day;
and he also had a Police Department cell phone and pager. (Hare
Affidavit ¶ 10). According to Mr. Hare's testimony, before
December 1, 2000, he was in charge of the Evidence Technical
Unit, Latent Fingerprint Unit, K-9 Unit, Auxiliary Police Unit,
Police Department Evidence Locker and Crime Suppression Unit, as
well as the Badge Grand Program. (Hare Affidavit ¶ 8). Mr. Hare
testified that, on December 1, 2000, Chief Zitek took away the
unmarked car and stripped Mr. Hare off all of the above duties
and responsibilities. (Hare Affidavit ¶ 11). Instead, after
December 1, 2000, according to Mr. Hare's testimony, he worked
the 3 p.m. to 11 p.m. shift, with limited overtime opportunities.
(Hare Affidavit ¶ 11).

On or about January 18, 2001, Chief Zitek issued a
memorandum, which included changes in shifts and assignments for
members of the Police Department. (Plaintiff's Exhibit 34).
Mayor Tabor testified that Chief Zitek had the authority to make
shift changes. (Tabor Dep. 7/23/04 p. 126). As a result of the
changes, many officers filed grievances with the Union and the
changes were, for the most part, overruled. (Fox Dep. pp. 71-72;
Kozelka Dep. pp. 35-36; Kretch Dep. p. 230). The changes Chief
Zitek made to Mr. Hare's assignment were not overruled, despite
Mr. Hare's multiple requests to Chief Zitek on December 1, 2000,

on January 24, 2001, and on January 26, 2001, for an explanation as to why his shift was changed and for a transfer back to the day shift. (Mr. Hare's letters: Plaintiff's Exhibits 33, 37, 38). On January 29, 2001, Chief Zitek issued another memorandum, stating that Mr. Hare's assignment to the 3-11 shift was permanent. (Plaintiff's Exhibit 39).

Chief Zitek does not dispute that he changed Mr. Hare's duties, but he testified that he did so because of the Heather Hanlon incident on July 17, 2000. (Zitek Dep. 6/25/04 p. 440). Chief Zitek also testified that, after the Heather Hanlon incident, he wanted Mr. Hare as far away from him as possible, and that he felt that he couldn't trust Mr. Hare. (Zitek Dep. 6/23/05pp. 143, 145).

On April 10, 2001, after Mayor Tabor's political party won the Village elections, Chief Zitek wrote a memorandum to Mayor Tabor and the Board of Trustees, requesting that the rank of Commander be eliminated, and that Mr. Hare be returned to his civil service rank of Lieutenant. (Tabor Dep. 1/26/05 pp. 21; Plaintiff's exhibit 40). In this memorandum, Chief Zitek explained his request by referring to the argument he had with Mr. Hare in July, 2000. (Plaintiff's exhibit 40). On April 19, 2001, Mr. Hare wrote to Chief Zitek to clarify his duties, and in the letter, he told Chief Zitek that he considered his change in

20

job duties to be an act of retaliation. (Plaintiff's Exhibit 41). Mr. Hare never received a response to this letter. (Zitek Dep. 6/25/04 p. 465).

Mr. Hare also alleges that Chief Zitek retaliated against him by trying to force criminal charges against him as a result of a comment Mr. Hare made during a victim interview at the police station. (First Amended Complaint ¶¶ 30-35). On December 6, 2000, Kim Koudelka came into the Stickney police station claiming that she had been the victim of an assault. (Koudelka Dep. p. 10). Ms. Koudelka stated that she managed to get away from her attacker and drove to the police station, where she spoke with Mr. Hare. (Koudelka Dep. p. 11). Police officers made a sketch of the assailant based on her description, and then took photographs of her injuries. (Ms. Koudelka Dep. p. 12). During the time the photographs were taken, Mr. Hare was present in the room and asked, jokingly, whether Ms. Koudelka would like some wallet-sized photographs. (Koudelka Dep. pp. 13-14). Ms. Koudelka testified that the comment made her angry, but that everything made her angry at that time; she testified that the comment did not make her uncomfortable. (Koudelka Dep. p. 14).

Theresa Sheputis, Ms. Koudelka's mother, saw Chief Zitek during the municipal elections in April, 2001, and asked him about the investigation of her daughter's assault. (Sheputis

Dep. pp. 8-10). Ms. Koudelka testified that, after the conversation with her mother, Chief Zitek called her more than 20 times in an effort to get her to come to the police station. (Koudelka Dep. p. 147). Ms. Koudelka testified that Chief Zitek was asking her about the wallet size comment made by Mr. Hare and characterizing it as "sexual harassment;" so she advised Mr. Hare about it, and he referred her to Ms. Stratton. (Koudelka Dep. p. 130).

According to Ms. Koudelka's testimony, she met with Ms. Stratton and complained that Chief Zitek was upsetting her mother with his calls, offering her daughter gifts, talking about her apartment, her landlord and her children, and referring to her sons' driving records. (Koudelka Dep. pp. 65, 193). Ms. Koudelka testified that she believed Chief Zitek was trying to bribe and threaten her in an effort to get her to file a sexual harassment complaint against Mr. Hare. (Koudelka Dep. pp. 176, 193-194).

Chief Zitek admitted that he tried to contact Ms. Koudelka and that he left several messages at her home and at her work, but he denied talking to her, personally or on the phone. (Zitek Dep. 12/20/04 pp. 596-597). Ultimately Chief Zitek contacted the Cook County Sheriff's Police in connection with Mr. Hare's wallet size comment to Ms. Koudelka. (Zitek Dep. 12/20/04 pp. 555-556).

22

Trustee Dolezal testified that, in his entire experience as a Village Trustee, he had never seen any other instance where the Cook County Sheriff's Police were called in to conduct an internal affairs investigation for the Village of Stickney Police Department. (Dolezal Dep. pp. 103-104). Detective Mallon was assigned to the case on May 15, 2001. (Mallon Dep. p. 18). After she completed the investigation, Detective Mallon concluded that there was nothing sexual in nature about Mr. Hare's comment and that Mr. Hare had not committed any crime. (Mallon Dep. p.78).

Another allegation of retaliation against Mr. Hare involves Chief Zitek's application to revoke Mr. Hare's firearm license. In the fall of 2001, over a year after the July 17, 2000, altercation between Chief Zitek and Mr. Hare, Chief Zitek asked the Illinois State Police Fire Arms Owners Identification Unit to revoke Mr. Hare's Owner's Identification Card. (Zitek Dep. 12/20/04 p. 629-630). Chief Zitek requested this revocation after reading Mr. Hare's disability hearing transcript. (Zitek Dep. p. 628). Chief Zitek admitted that he had never before made such a request, but he testified that he felt compelled to do so with respect to Mr. Hare, because he felt Mr. Hare was a danger to him, given the incident of July 17, 2000, and given that Chief

23

Zitek thought that Mr. Hare lied about him during the pension hearing. (Zitek Dep. 12/20/04 pp. 631, 636-637).

Mr. Hare also claims that, as a part of the retaliation, the Village tried to interfere in his disability hearings. (First Amended Complaint, ¶ 42). On August 6, 2001, Mr. Hare filed his application for a disability pension with the Stickney Police Pension Board, seeking a duty-related disability. (Plaintiff's Exhibit 46). During Mr. Hare's pension hearings, the Village asked to participate in the hearing before the Pension Board, which was apparently unprecedented. (Tabor Dep. 1/26/05 pp. 58-59; Dolezal Dep. pp. 96-97). The Pension Board denied the Village's request, and awarded Mr. Hare a line of duty disability pension. (Board Transcript p. 19; Plaintiff's Exhibit 46 – Decision and Order, p. 8). It is unclear who exactly in the Village made the decision to intervene and why, as there is no evidence that the Village Board took any official action on this issue. (Tabor Dep. 1/26/05 p. 53).

After Mr. Hare was awarded his line of duty disability, he alleges that the Village interfered in the next Pension Board elections to ensure that the Pension Board was under the Village's control in order to reverse Mr. Hare's pension award. (First Amended Complaint, ¶ 42; Plaintiff's memorandum in opposition of the motion for summary judgment). Several former

24

members of the Pension Board testified that, until Mr. Hare's pension hearing, no Village official had ever played a role in conducting the Pension Board elections. (Stromski Dep. p. 10; Philippon Dep. p. 32). Even though the Pension Board would usually run elections and do the paperwork, in April, 2002, the first elections since Mr. Hare was awarded disability, the Village ran the elections. (Kretch Dep. pp. 225-226).

First, Trustee Dolezal asked Penelope Gibas, who was unhappy with Mr. Hare's disability award, to run for the Pension Board. (Gibas Dep. pp. 40-41, 87). Village trustees went to the homes of individuals entitled to vote in the elections to campaign for Ms. Gibas. (Dolezal Dep. pp. 88-89). Diane Barrett, Ms. Gibas's sister-in-law, was appointed to the Stickney Police Pension Board by Mayor Tabor. (Barrett Dep. pp. 7-8). Ms. Barrett testified that a Village Trustee, not a member of the Pension Board, helped her through the elections procedures and drafted documents for her on Village stationary. (Barrett Dep. pp. 19, 21-22, 25-26). Ms. Gibas testified that she does not know who prepared the ballot with her name on it, but she received her pension election ballot from Trustee Dolezal. (Gibas Dep. pp. 43-44, 46).

Next, several police officers testified that the Deputy Chief and Commander at the time distributed the election ballots and required the officers to sign the ballots in front of them.

25

(Sladetz Dep. p. 23; Walik Dep. p. 41; Kretch Dep. p. 227).
According to one of the Board members, most of the individuals
present at the ballot opening were the Village representatives:
Mayor Tabor, Ms. Barrett, who was sworn into her position at the
beginning of the process by Mayor Tabor, the Village Clerk, the
Village attorney, candidate Gibas, and Mr. Kadolph, a Pension
Board trustee. (Kadolph Dep. pp. 41-42). While Ms. Gibas denies
that she was present at the vote counting, Mr. Kadolph testified
that Ms. Gibas opened the ballots. (Gibas Dep. p. 55; Kadolph
Dep. p. 73-74). Mayor Tabor also denies being present at the
meeting. (Tabor Dep. 1/26/05 p. 52).

Finally, when the newly elected Pension Board met for the
first time on May 20, 2002, Ms. Barrett made a motion to go into
Executive Session to discuss pending litigation against Mr. Hare.
(Barrett Dep. pp. 40-41). Peter Felice, the Village prosecutor,
was present during this discussion, although no Pension Board
trustee or Village official seems to know why he was there.
(Dolezal Dep. pp. 99-100; Gibas Dep. pp. 67-70; Barrett Dep. p.
36).

F.   Allegations of Retaliation
     Against Other Police Officers

Mr. Hare also argues that he was not the only officer who
suffered retaliation as a result of his grand jury testimony.

26

For example, several officers who participated in the SAO investigation or testified in front of the grand jury passed the Sergeant Exam, but were not promoted. (See Plaintiff's Exhibit 51, 52). Some officers also testified that, during an oral portion of their Sergeant test, the examiners did not ask them any questions, which they found to be unusual. (Kozelka Dep. pp. 39-40; Fox Dep. p. 5, 90).

Additionally, several officers testified that Chief Zitek treated them differently after the SAO investigation. For instance, Officer Joe Kretch was one of the initial officers who went to the SAO in August 2000 to complain about corruption. (Kretch Dep. p. 13). Officer Kozelka testified that Chief Zitek asked him to file false accusations against Officer Kretch and became angry when officer Kozelka refused to do it. (Kozelka Dep. pp. 60-63). Officer Jeff Walik was also one of the officers who went to the SAO in 2000. (Hare Dep. 8/13/03 p. 288, Philippon Dep. p. 7, Kretch Dep. p. 13). Officer Walik testified that Commander Wiseman started writing him up under the order from Chief Zitek after Officer Walik cooperated with the SAO. (Walik Dep. pp. 24, 28). Officer Walik also testified that Chief Zitek forced an individual to file a complaint against Officer Walik for theft, and even though this person later found his money and apologized, the incident was never cleared from Officer

Walik's record. (Walik Dep. pp. 64-65). Officer Walik testified that prior to being labeled as a "whistleblower" he had never been reprimanded. (Walik Dep. p. 66).

Officer Page, who was also among the original "whistleblowers," was terminated in May 2001. (Zitek Dep. 12/20/04 at 513, Plaintiff's Exhibit 21). Officer Page testified that Trustee Dolezal told him that he was labeled as one of the "whistleblowers," and that Mayor Tabor told him that his termination was a board decision. (Page Affidavit ¶¶448-462, 466). Chief Zitek testified that he fired Officer Page, because he did not work enough hours. (Zitek Dep. 12/20/04 p. 513).

## Procedural History of the Case

Mr. Hare filed his original complaint on June 4, 2002. By consent of the parties, the case was transferred first to Magistrate Judge Bobrick, and, upon his retirement, to this Court. On October 28, 2002, Judge Bobrick entered an order dismissing some of the original parties from the complaint. On January, 22, 2003, Judge Bobrick denied a motion to dismiss the remaining defendants. On March 10, 2005, Mr. Hare filed his First Amended Complaint, which adds Donald Tabor as a defendant and adds an allegation that Chief Zitek and Mayor Tabor conspired to violate Mr. Hare's First Amendment rights.

The First Amended Complaint contains two counts and asserts that the defendants retaliated against Mr. Hare and conspired to retaliate against him, because he testified about alleged corruption at the Police Department before the Cook County grand jury. On June 20, 2005, all defendants jointly moved for summary judgment on all counts.

In their motion, the defendants argue that Mr. Hare's speech did not involve matters of public concern; that the changes in Mr. Hare's duties and responsibilities did not amount to an adverse action; and that any action Mr. Hare might have perceived as adverse was the result of the July 17, 2000, argument between Mr. Hare and Chief Zitek. The defendants also argue that there is no legal basis for holding the Village liable, because there is no custom or practice of retaliation against employees, and because Chief Zitek and Mayor Tabor do not have the final policymaking authority. Finally, the defendants contend that Mr. Hare failed to offer sufficient evidence to support a conspiracy claim.

On September 1, 2005, Plaintiff filed his response, arguing that, in fact, the record evidence establishes that his speech was constitutionally protected and that it was the motivating factor for the retaliation that followed. Mr. Hare also contends that the changes in his job duties, and the harassment he

29

suffered at the hands of the Village amount to adverse actions.
Finally, Mr. Hare argues that municipal liability is appropriate
here, because Chief Zitek and Mayor Tabor had final policy making
authority, and because, their protestations to the contrary
notwithstanding, the Village does have a widespread custom of
retaliation against individuals who expose improprieties in the
Village.

The defendants were given an opportunity to file a reply
brief. In fact, the defendants asked this Court for an extension
to file the brief, and the Court granted the extension.
Nevertheless, they never filed a reply. Instead, they filed
three motions to strike.

## Discussion

Before the Court are the defendants' motion for summary
judgment, and defendants' three motions to strike. The Court
will consider the latter first, as those motions may determine
what evidence is and is not available for consideration on
summary judgment.

A. Defendants' Motions to Strike

Before turning to the question of whether summary judgment
is appropriate in this case, the Court must address defendants'
motions to strike. The defendants have moved to strike Mr.
Hare's affidavit on the ground that parts of the affidavit

30

contradict Mr. Hare's prior testimony and contain some conclusory assertions; they have moved to strike Mr. Hare's responses to their statement of facts, arguing that some responses to the statements are not concise, and that some responses contain improper arguments adding immaterial facts or do not properly cite to the record; and they have moved to strike Mr. Hare's statement of additional facts on the ground that the statements are not concise and that they do not contain additional facts and are immaterial. The Court will consider each motion in turn below.

1. Defendants' Motion to Strike Mr. Hare's Affidavit

The defendants first argue that this Court should strike Mr. Hare's affidavit for two reasons: (1) the affidavit contradicts Mr. Hare's prior testimony, and (2) the affidavit contains conclusory assertions. Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits filed in opposition to a motion for summary judgment be based "on personal knowledge," setting forth "such facts as would be admissible in evidence," and showing "that the affiant is competent to testify to the matters stated therein." (Fed. R. Civ. P. 56(e)). A party opposing a motion for summary judgment cannot create "sham" issues of fact by filing affidavits that contradict prior

deposition testimony. *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005).

The defendants first contend that, in his affidavit Mr. Hare contradicted his prior deposition testimony by listing his suspicions of corrupt activities, in which Chief Zitek was allegedly involved. The defendants, in particular, point to ¶16 of the affidavit, in which Mr. Hare stated:

> I advised Mr. Rivkin our *concerns* were that Chief Zitek was either stealing or skimming Village money. That he was running an unlicensed security company and details out of Police Department. That he was utilizing Village and police equipment for these security details and we did not *think* the Village was being properly reimbursed for those services and the use of the Village's equipment.

(Hare Affidavit, ¶16 (emphasis added)). The defendants compare this statement with several parts of Mr. Hare's deposition, where he admitted that he did not really *know* whether Chief Zitek was involved in criminal activity (Hare Dep. 8/13/03 p. 276), or that he did not *know* that Chief Zitek benefitted from the security details (Hare Dep. 4/28/04 pp. 72-73). Not *knowing* something as a fact would not necessarily preclude Mr. Hare from having *concerns* or from *thinking* that the fact was actually true. Moreover, a significant amount of Mr. Hare's deposition testimony, as stated in the fact section, actually expresses Mr. Hare's concerns about the way Chief Zitek operated security

details and handled the Village funds.

The defendants also point to another isolated and general statement made by Mr. Hare during his Pension Board Hearing - that his job duties were "done" and the entire detective unit was completely disbanded "within a very short period of time" after the Heather Hanlon incident. (Defendants' exhibit 5: Hare's transcript of Police Pension Board Hearing, pp. 57-58.) The defendants consider this testimony contradictory to Mr. Hare's testimony in his affidavit that his job duties were not changed until December of 2000. (See Hare Affidavit ¶¶ 8-11; defendants's motion to strike plaintiff's affidavit p. 3).

First, Mr. Hare's statement does not give the exact date when his duties were changed, therefore, it does not necessarily contradict his affidavit. Second, during the same Pension Board hearing, only a few pages further in the transcript from the section highlighted by the defendants, Mr. Hare stated that his shifts and job duties changed in December 2000, after his grand jury testimony, which is consistent with what he said in his affidavit. (Defendants' exhibit 5: Hare's transcript of Police Pension Board Hearing, pp. 60-63).

Next, the defendants argue that Mr. Hare's affidavit should be stricken, because it contains conclusory statements. Under Rule 56(e), affidavits filed in opposition to a motion for

summary judgment must be based on personal knowledge. (Fed. R. Civ. P. 56(e)). Personal knowledge may consist of opinions and inferences. *Drake v. Minnesota Mining and Manufacturing Company*, 134 F.3d 878, 887 (7th Cir. 1988). However, a party opposing a motion for summary judgment cannot defeat the motion by filing an affidavit "with conclusory assertions, unsupported by specific facts". *Thomas v. Christ Hospital and Medical Center*, 328 F.3d 890, 894 (7th Cir. 2003).

The defendants point specifically to three statements made by Mr. Hare in his affidavit as conclusory: that a village attorney interviewed him about "allegations of corrupt practices," that Mr. Hare and other individuals were "whistleblowers" and that Mr. Hare used the word "retaliation."

The defendants want to strike Mr. Hare's statement that Village attorney Rivkin interviewed him about "allegations of corrupt practices." This statement, however, refers to Mr. Hare's *allegations* of corrupt practices, and offers no conclusion as to whether the Village was actually engaged in those practices. Additionally, further parts of the affidavit offer specific instances of practices Mr. Hare considered corrupt. Therefore, this statement is not conclusory.

Next, the defendants take issue with Mr. Hare's use of the word "whistleblowers." *Black's* Law Dictionary defines the word

34

"whistleblower" as "an employee who reports employer wrongdoing
to a governmental or law-enforcement agency." (Black's Law
Dictionary, 8th ed.). Since Mr. Hare testified in the same
paragraph about his testimony in front of the grand jury about
his suspicions of wrongdoings at the Police Department, the word
"whistleblower" in this context is simply descriptive and not
conclusory.

Finally, the defendants object to Mr. Hare's use of the word
"retaliation" in his affidavit as conclusory. Again, the
defendants take the word out of context. Mr. Hare's statement is
that he was unsure as to whether he disclosed the names of other
whistleblowers to Mr. Rivkin, "because of fear for their safety
from retaliation or reprisal due to Police Department rules and
regulations." (Plaintiff's exhibit 3: Hare Affidavit ¶15). Mr.
Hare does not offer a conclusion that the Village retaliated
against him, he describes his concerns about revealing the
identity of other officers that testified in front of the grand
jury. He supports this concern with the subsequent statement
that the Police Department had a policy, which prohibited police
officers from speaking to Village Officials without consent from
the Chief of Police. (Hare Affidavit ¶15). The statement is not
conclusory, and it is supported by specific facts.

In short, the Court disagrees with the defendants'
contention that Mr. Hare's affidavit contradicts his previous
testimony and that it contains conclusory statements unsupported
by specific facts. Accordingly, the Court denies defendants'
motion to strike Mr. Hare's affidavit.

2.   Defendants' Motion to Strike Plaintiff's
     Responses to their Statement of Facts

Next, the defendants move to strike Mr. Hare's responses to
the defendants' Statement of Material Facts ("SOF"). Defendants
offer several reasons for the motion: (1) Mr. Hare's responses
include improper arguments, (2) Mr. Hare's responses are non-
responsive, and (3) Mr. Hare's responses improperly cite to the
record.

Under Local Rule 56.1(b), a party opposing a motion for
summary judgment shall file a concise response to the movant's
statement, which should include "a response to each numbered
paragraph in the moving party's statement," including "specific
references to the affidavits, parts of the record, and other
supporting materials relied upon."  (L. R. 56.1(b)(3)(A)).
Failure to comply with the Local Rule may result in the
paragraphs with inadequate responses being deemed admitted.
*Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687,
689 (7th Cir. 2000).

The Court agrees with the defendants that certain statements in Mr. Hare's response to the defendants' SOF are indeed argumentative and non-responsive, and the Court will, therefore, strike the responses to ¶¶ 16, 38, 57, 58, 67, 74, 81, 120, 143, 163, 194, 203, 206, 242, and 251, and will consider those statements admitted to the extent they are supported by the record. The Court notes, however, that some of the defendants' statements similarly violate Local Rule 56.1(b)(3)(A), such as ¶¶ 111, and 175, and the Court will not strike Mr. Hare's responses to those paragraphs.

The defendants' argument that the citations to the record are improper are based mostly on the fact that instead of referencing each sentence, Mr. Hare, in many instances, provided support for several sentences at the end of the response. Since Mr. Hare did cite to the record, the Court sees no reason to punish him for a stylistic error by striking the majority of his responses. To the extent that the defendants complain that Mr. Hare's responses are not supported by any citation to the record, the defendants identify one such response - ¶16, and this response has already been stricken on other grounds.

Finally, to the extent that the defendants ask this Court to strike all paragraphs that include citations to Mr. Hare's

affidavit, the Court has addressed the motion to strike the affidavit above.

The Court notes that the defendants' SOF is hardly an example of a perfect adhesion to Local Rule 56.1. The SOF contains several improper conclusory sentences without citations to any part of the record, such as "although there was extensive written and oral discovery, there is no evidence to support Hare's allegations of retaliation" (Defendants' SOF ¶ 111); and "to the extent Hare's allegations pertains to Heather Hanlon, the radio dispatcher who resigned as a result of the incident described in Section II(C) above, there is no evidence to support such allegations" (Defendants' SOF ¶ 175). Such statements belong in the memorandum in support of the motion, not in the statement of facts.

3. Defendants' Motion to Strike Mr. Hare's
   <u>Statement of Additional Facts</u>

The defendants' final motion seeks to strike Mr. Hare's statement of additional facts on the grounds that the statements are neither concise nor relevant, and that they lack proper citations. Under Local Rule 56.1, a party opposing a motion for summary judgment may file a statement "of any additional facts that require the denial of summary judgment." L.R. 56.1(3)(B). Several judges in this district have pointed out that motions to

strike additional statements of facts, while permissible, are often unnecessary, because a party has a chance to dispute the statement in a reply, and because statements unsupported by facts will be disregarded. *Hanania v. Loren-Maltese*, 319 F.Supp.2d 814, 819 (N.D.Ill. 2004); *Fenje v. Feld*, 301 F.Supp.2d 781, 789 (N.D.Ill. 2003); *Newsome v. James*, 2000 WL 528475 at *3 (N.D. Ill. 2000). The defendants, however, chose not to file a reply brief, but rather challenge Mr. Hare's statements and responses, therefore, the Court must rule on their motion.

The defendants first argue that the statements offered by Mr. Hare in his SOF are not concise. The Court disagrees. The majority of Mr. Hare's statements are three lines or less.

The defendants next ask this Court to strike almost 700 of Mr. Hare's 887 statements on the ground that they are irrelevant. Among the statements that the defendants would like stricken as irrelevant are statements regarding Mr. Hare's appointment as Commander and his duties in that position (Plaintiff's SOF ¶¶47-50); statements that indicate that Trustee Dolezal informed Mayor Tabor about Mr. Hare's involvement in the SAO investigation in October 2000 (Plaintiff's SOF ¶¶ 216-219); and statements about the Heather Hanlon incident (Plaintiff's SOF ¶¶ 133-163), just to name a few. As should be clear from the Court's recitations of the facts above, these statements are relevant to both Mr. Hare's

39

complaint and to the defendants' motion for summary judgment.
For example, statements about Mr. Hare's duties as a Commander
after his appointment are relevant to determine whether Mr. Hare
suffered any adverse employment action. Statements about Trustee
Dolezal's conversation with Mayor Tabor in October 2000 about Mr.
Hare's participation in the SAO investigation are relevant to the
defendants' claims that the Mayor and Chief Zitek did not know
about Mr. Hare's participation in the investigation until much
later. Finally, statements about the Heather Hanlon incident are
relevant to the defendants' argument that any adverse action that
Mr. Hare might have suffered was a result of the argument between
Mr. Hare and Chief Zitek about this incident.

Next, the defendants argue that many of the statements
should be stricken because they are improperly cited. By way of
example, the defendants seek to strike ¶ 76, which reads as
follows:

When Hare reported the discrepancies in the
evidence room to Chief Zitek, Chief Zitek told him
"don't worry about it, it lies with the dead man."
Zitek laughed and said "don't worry about it, it's
over, don't worry about it." (Hare Dep. Tr. 6/13/03
p. 91)

Page 91 of Mr. Hare's transcript taken on June 13, 2003,
contains the following exchange:

Q.   When you first reported the discrepancies that
you were finding while the preliminary audit

40

was taking place to Chief Zitek, what did he
                tell you?
        A.      Don't worry about it, it lies with the
                deadman.
        Q.      Did he say anything else?
        A.      Don't worry about it.
        Q.      Did he say anything else other than that it
                lies with the deadman, don't worry about it
                and laugh?
        A.      It's over, don't worry about it.

As is readily apparent, Mr. Hare's statement does contain a

citation to the record - and an accurate one at that.   The

defendants' failed to persuade the Court that Mr. Hare's

statements of facts should be stricken, and the motion is,

therefore, denied.

B.   Defendants' Motion for Summary Judgment

     Having determined which evidence should be considered and

which should be stricken, the Court now turns to the defendants'

motion for summary judgment. Summary judgment is appropriate

where pleadings and supporting documents show that "there is no

genuine issue as to any material facts and that the moving party

is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Whether a genuine issue of material facts exists is determined by

the governing substantive law. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). In making this determination, the

Court views the facts and draws all reasonable inferences "in the

41

light most favorable to the non-moving party." *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir.1999). In a summary judgment proceeding, courts do not make credibility determinations or choose between competing inferences. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir.1993).

The moving party initially bears the burden of showing that, based on the record, no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323. The moving party can discharge this burden by pointing out to the district court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the moving party sustains its burden, the party opposing the motion "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. To survive a motion for summary judgment, the non-moving party must show more than a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co, v. Zenith Radio Corp.*, 475 U.S. 574, 596 (1986). The non-moving party must also present sufficient evidence to support each element on which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Simply relying "upon the mere allegations or denials of the adverse party's pleading" would not constitute sufficient evidence. *Anderson*, 477 U.S. at 248.

## 1. Mr. Hare's Retaliation Claim

In his complaint, Mr. Hare alleges that the defendants retaliated against him for exercising his First Amendment right and speaking out about alleged corruption at the Police Department. The Seventh Circuit has instructed that the First Amendment retaliation claims must be analyzed under a three part test. *Cygan v. Wisconsin Dept. of Corrections*, 388 F.3d 1092, 1098 (7th Cir. 2004). First, the plaintiff must show that his speech was constitutionally protected. *Id.* This inquiry is based on the *Connick-Pickering* test. *Id.* at 1099-1100. Second, the plaintiff must show that he suffered an adverse employment action and that his speech was "a substantial or motivating factor" for that action. *Id.* at 1098. Finally, if the plaintiff satisfies the first two elements, the defendants have an opportunity to show that the plaintiff would have been subject to the same action even in the absence of his exercise of the protected speech. *Id.*

The defendants have argued that Mr. Hare's claim falls short on all three parts of the test: they argue that this speech was not constitutionally protected, that any mistreatment he suffered was a result of the Heather Hanlon incident and not a result of his whistleblowing, and that, given the Heather Hanlon incident,

43

he would have suffered the same mistreatment even if he had not
testified before the grand jury.

a.  Was Mr. Hare's Speech Constitutionally Protected?

The Court must first determine whether Mr. Hare's speech was
constitutionally protected. This determination is made under the
two-step *Connick-Pickering* test, which requires the Court to
consider whether the speech in question addresses matters of
public concern, and, if it does, whether the government's
interest as an employer outweighs the employee's interest in
commenting upon the matter of public concern. *Wernsing v.
Thompson*, 423 F.3d 732, 750-51 (7th Cir. 2005). Whether the
speech is constitutionally protected is a question of law to be
decided by the Court. *Kokkinis v. Ivkovich*, 185 F.3d 840, 843
(7th Cir. 1999).

To decide whether speech touches on matters of public
concern the Supreme Court in *Connick v. Myers* examined the
content, form, and context of the speech. 461 U.S. 138, 147-148
(1983). The *content* of the speech is most important. *Delgado v.
Jones*, 282 F.3d 511, 517 (2002). However, *context* too is
important in terms of whether the speech was maliciously made and
promoted purely personal interests of the speaker. *Button v.
Kibby-Brown*, 146 F.3d 526, 529 (7th Cir. 1998).

44

The Seventh Circuit has explained that the "public concern" element is satisfied when the plaintiff shows that his speech related to "matters of political, social, or other concern to the community" rather than a personal grievance of an employee. *Anderer v. Jones*, 385 F.3d 1043, 1053 (7th Cir. 2004). Speech that focuses on police departments is generally considered a matter of public concern. *Delgado*, 282 F.3d at 517. Speech alleging government corruption is also of public concern. *Schad v. Jones*, 415 F3d. 671, 675 (7th Cir. 2005).

To satisfy the *Connick-Pickering* test, the plaintiff must speak as a citizen about the matters of public concern, and not as an employee about internal disagreements with the employer. *Connick*, 461 U.S. at 147. For example, when an Assistant District Attorney circulated a survey to determine her co-workers' opinions about the office transfer policies, level of confidence in the supervisors, and pressure to work in political campaigns, the Supreme Court concluded that this speech was not constitutionally protected. *Id.* at 140-141, 148. The Court stated that this speech did not seek to "bring to public light actual or potential wrongdoing or breach of public trust," but at best expressed one employee's dissatisfaction with internal policies. *Id.* at 148.

45

On the other hand, where police officers publicized the order of their Field Deputy Inspector preventing follow-up investigations without his permission, a substantial departure from the previous department protocol, the Seventh Circuit decided that it would "require some metal gymnastics" to find that the officers' speech did not touch on matters of public concern. *Gustafson v. Jones*, 290 F.3d 895, 900, 902, 907 (7th Cir. 2002). Similarly, the Seventh Circuit has found that speech touches on matters of public concern when it exposes misconduct by government officials. *See, e.g., Spiegla v. Hull*, 371 F.3d 928, 936-937 (7th Cir. 2004); *Sullivan v. Ramirez*, 360 F.3d 692, 693, 699 (7th Cir. 2004); *Breuer v. Hart*, 909 F.2d 1035, 1039 (7th Cir. 1990).

Mr. Hare's grand jury testimony concerned his suspicions that a Stickney Police Department official was engaged in corrupt practices and that he misappropriated money belonging to the Village. Mr. Hare suspected that Chief Zitek misappropriated cash from bond postings and parking tickets, received compensation for work he did not perform, and manipulated articles from the evidence locker. Unlike the speech at issue in *Connick*, Mr. Hare's speech *did* seek to bring to light potential wrongdoings of a public official. It was not simply a complaint about internal department policies; it concerned allegations that

46

a public official was stealing and misusing money that belonged to the Village. If true, Mr. Hare's allegations would surely prove that Chief Zitek breached the public trust and violated the law. And in fact, the SAO investigation that sprang from the information provided by Mr. Hare and his fellow police officers uncovered the misappropriation of over $200,000.

The defendants apparently concede that Mr. Hare's speech touched upon matters of public concern. Yet they contend that Mr. Hare's speech was maliciously and falsely made, with an eye towards promoting only Mr. Hare's personal interests in getting revenge against Chief Zitek for not firing Ms. Hanlon, and in getting Chief Zitek removed from his position so that Mr. Hare could become the next Chief of Police. The evidence in the record, however, does not support this contention.

The defendants argue that, because Chief Zitek was not indicted as a result of Mr. Hare's grand jury testimony, Mr. Hare's statements must have been malicious lies. This argument is not only illogical, it is unsupported in the record. There is ample evidence presented that Mr. Hare and other Stickney Police Department officers witnessed what they believed to be unlawful acts by Chief Zitek. Even Ms. Stratton, the SAO prosecutor in charge of the investigation, testified that she believed that Chief Zitek committed unlawful acts.

47

The defendants also argue that Mr. Hare testified in front of the grand jury in retaliation for the Heather Hanlon incident, and as a means of ousting Chief Zitek from the position of Chief. But Mr. Hare and the other officers involved in bringing the corruption to light all testified that they met to discuss their suspicions of corruption on numerous occasions *before* the Heather Hanlon incident. And the record shows that Mr. Hare discussed his concerns and suspicions with an attorney – though not a State's Attorney – before the Heather Hanlon incident occurred. Additionally, there is no evidence in the record that Mr. Hare would have become the next Chief of Police if Chief Zitek had been removed.

The evidence does suggest that the Heather Hanlon incident may have been the final straw that compelled Mr. Hare to contact the SAO. However, even if Mr. Hare had some personal interest in coming forward with the information, such personal interest is not dispositive. The Seventh Circuit has held that an employee's "personal stake in the subject matter of the speech does not necessarily remove the speech from the scope of public concern." *Button*, 146 F.3d at 529. It often happens that the employees who have some personal stake in exposing wrongdoings of public officers are the only ones who bring these wrongdoings to the attention of appropriate authorities. *Breuer*, 909 F.2d at 1039.

48

The speech is unprotected only when it is motivated *purely* by private interests and addresses *only* the personal affect of the misconduct on the employee. *Marshall v. Porter County Plan Commission*, 32 F.3d 1215, 1219 (7th Cir. 1994).

The record indicates that, while the Heather Hanlon incident may have been related to Mr. Hare's decision to contact the SAO, it was not the determinative factor. Mr. Hare and his fellow officers had been discussing how to proceed with their suspicions of corruption before the incident. The allegations concerned Chief Zitek's conduct that had no personal affect on Mr. Hare, because there is no evidence that Mr. Hare personally benefitted from exposing misappropriations of public funds. At the same time, Mr. Hare's testimony in front of the grand jury served a significant public purpose - it helped expose more than $200,000 of misappropriated public funds. Even if Mr. Hare's speech was partially motivated by his disagreement with Chief Zitek over the Heather Hanlon incident, this private motivation is outweighed by the public nature of the speech and the significant interest of the community in discovering wrongdoings by public officials. Therefore, Mr. Hare has demonstrated that his speech touched on matters of public concern and was not motivated by purely private interests.

Having determined that Mr. Hare's speech touched on matters of public concern, the Court must next address the second part of the *Connick-Pickering* test and balance the interest of the employee to engage in the speech against the interest of the government as an employer. *Sullivan*, 360 F.3d at 698. To decide whether the need for speech outweighs the government's interest, the Court will consider (1) the government's need to maintain discipline and harmony at the work place, (2) the need for confidentiality, (3) the need to prevent conduct that interferes with employees' performance, and (4) the need to encourage loyalty, confidence and a close relationship between employees and superiors. *Breuer*, 909 F.2d at 1040-1041. The more important the matters of public concern, the stronger the showing of the government interest must be to prevent disclosure of such matters. *Connick*, 461 U.S. at 152.

In this case, Mr. Hare's speech involved a subject of significant public concern – the suspected misappropriations of Village funds by Village officials. The defendants must, therefore, present evidence of a very strong municipality interest to outweigh the need for the speech.

The defendants argue that, because Mr. Hare met with other officers and Ms. Stratton before testifying in front of the grand jury, this somehow "disrupted the order and discipline of the

Police Department." They also argue that Mr. Hare's conduct distracted him from his professional duties and deprived the Village of his full services and attention. But the defendants do not point to any evidence in the record to show that the work of the Police Department was in any way disrupted or that Mr. Hare was distracted or performed his duties inadequately. Other than the altercation between Mr. Hare and Chief Zitek over the Heather Hanlon incident, which happened several months before the grand jury testimony, there is nothing in the record to suggest that there was a breakdown of discipline. There is also nothing in the record to suggest that Mr. Hare acted insubordinately at any time after the Heather Hanlon incident. Additionally, because the issues involved concern matters of corruption and misappropriation of funds, the municipality can have no interest in keeping this information confidential.

The defendants also argue that the Village's interest prevails in this case because Mr. Hare's statements were erroneous, if not malicious. The Seventh Circuit has held that an employer has a strong interest in preventing erroneous statements, and an even stronger interest in preventing deliberate falsehoods. *Wright v. Illinois Department of Children and Family Services*, 40 F.3d 1492, 1505 (7th Cir. 1994). However, the truth of the statements influences the balancing

test only to the extent that the employer took action to prevent

the speech at issue because it reasonably believed at the time

that the speech was untrue and potentially damaging to the work

place. *McGreal v. Ostrov*, 368 F.3d 657, 677 (7th Cir. 2004).

The defendants, however, do not claim that they believed Mr.

Hare's speech was untrue; in fact, they argue that Village

officials did not even know about Mr. Hare's participation in the

SAO investigation until much later in the process. So, even if

Mr. Hare's statements were erroneous, that fact would have no

bearing on the balancing test, because, according to the

defendants, they did not know about the speech.

Additionally, as discussed above, the record contains no

evidence that Mr. Hare had maliciously manufactured allegations

about his suspicions of Chief Zitek's conduct. On the contrary,

Mr. Hare was only one of several officers who believed that Chief

Zitek engaged in unlawful activity, and Ms. Stratton, an SAO

prosecutor, testified that she found Mr. Hare's testimony to be

credible.

When balancing the interests of the employee and the

government employer, the Court must also consider whether the

employee addressed his concerns through appropriate channels.

*Wright*, 40 F.3d at 1503. The Seventh Circuit has held that,

where employees exercise their speech through media channels, the

52

employer's interests may outweigh the need for speech if the speech prevents the employer from effectively carrying out its responsibilities. See e.g. Wright, 40 F.3d 1492 at 1497 (having lost in the internal policy battle on awarding a particular visitation policy to a father potentially involved in satanic rituals, the employee tried to subvert her supervisors' decision in the media and in court); Kokkinis, 185 F.3d at 841-843 (police officer stated on television that the public would be shocked by what was going on at the police department because of the police chief's vindictiveness); Jefferson v. Ambroz, 90 F.3d 1291, 1294 (7th Cir. 1996)(a probation officer misrepresented himself on the radio as a gang member to criticize the police department and the judicial district, making the calls to the radio station from home during work hours or from work). Mr. Hare did nothing that would have endangered the effective functioning of the Police Department. He did not go to the media; rather, he first contacted an attorney with whom he had a relationship, and then he took his concerns to the SAO's Public Integrity Unit, an appropriate agency to handle the corruption investigation.

Finally, the Seventh Circuit has noted that a district court can decide the Connick-Pickering question before trial only when the evidence in the record is clear and undisputed. McGreal, 368 F.3d at 677. With respect to the facts relevant to this issue,

that is the case here. Although the parties clearly disagree about many facts, there is no dispute that Mr. Hare's "speech" involved an important matter of public concern – namely, corruption at the police department. And the record is clear that, even if his speech was partially motivated by his private interests, Mr. Hare spoke about corruption as a citizen of the Village, and not as a disgruntled employee. Under the balancing test, there is no evidence in the record that Mr. Hare's testimony disrupted the functions or discipline of the Police Department, or that his speech in any way interfered with Mr. Hare's ability to perform his duties. Rather, the record shows that Mr. Hare "spoke" in good faith and that he pursued his allegations through the appropriate channels. In sum and in short, the Court finds that Mr. Hare's speech was constitutionally protected.

> b. Did Mr. Hare Suffer an Adverse
> Employment Action Because of His Speech?

Having determined that Mr. Hare's speech is constitutionally protected, the Court must next consider whether Mr. Hare suffered an adverse employment action, and, if he did, whether that action was a consequence of his speech. The defendants argue first that Mr. Hare suffered no adverse employment action. They also argue that, to the extent Chief Zitek's conduct caused Mr. Hare to

suffer such an action, that conduct was motivated by personal animosity and not by Mr. Hare's cooperation with the SAO.

Adverse employment action may include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Given this definition, it is clear that Mr. Hare did, in fact, suffer one or more adverse employment actions: he was reassigned from the Detective Unit to a Patrolling Unit, he was removed from his position of authority over several departments, his work shifts were changed to less desirable shifts, involving fewer opportunities for overtime pay, his work car and pager were taken away, and the Village took steps to reverse Mr. Hare's line of duty disability by interfering in the Pension Board proceedings and manipulating the Pension Board elections. Additionally, the record suggests that Chief Zitek started an unwarranted criminal investigation against Mr. Hare and sent requests to revoke Mr. Hare's firearm license. A reasonable jury could easily conclude that some or all of these events amounted to an adverse employment action.

But suffering the action is not enough; Mr. Hare must also show that his speech was a motivating factor for the adverse

55

employment action he suffered. He may do so by showing that the speech was "a consideration present in defendant's mind that pushed the defendant to act." *Hasan v. U.S. Dept. of Labor*, 400 F.3d 1001, 1006 (7th Cir. 2005). The defendants argue that Mr. Hare's cooperation with the SAO and his testimony in front of the grand jury was not a motivating factor in the actions that Mr. Hare alleges to be adverse. In fact, they argue that there is no evidence that Chief Zitek was even aware of Mr. Hare's part in the SAO investigation. But the record contains evidence that suggests otherwise.

For example, Mr. Hare testified that he told Trustee Dolezal about the SAO investigation in October 2000, and Trustee Dolezal allegedly shared this information with Mayor Tabor. (Hare Dep. 4/28/04 pp. 213-214; Dolezal Dep. p. 33). Ms. Stratton testified that she encountered Chief Zitek and Mayor Tabor during her interview with Ms. Madsen in October 2000, and that they made it clear to her that they knew about the investigation. (Stratton Dep. 11/19/03 pp. 107-108). Additionally, Mr. Hare testified that Mr. Rivkin, the Village attorney, interviewed him at the early stages of the investigation, and Mr. Hare told him everything he knew about the investigation. (Hare Affidavit ¶¶ 13-18). Given that Mr. Rivkin worked for Mayor Tabor, and given the seemingly close relationship between Mayor Tabor and Chief

Zitek, it would be easy to infer that the information Mr. Hare passed on to Mr. Rivkin may eventually have reached Chief Zitek.

Additionally, although the defendants have posited that Mr. Hare's mistreatment can be explained by the animosity created by the Heather Hanlon incident, the record evidence does not support that theory. For example, although Chief Zitek testified that he changed Mr. Hare's shift and duties immediately after the Heather Hanlon incident on July 17, 2000, Mr. Hare's testimony in front of the Police Department Pension Board, Chief Zitek's memoranda, and Mr. Hare's letters to Chief Zitek regarding his shift changes indicate that the changes actually did not occur until December 2000, almost five months after the Heather Hanlon incident, but only a short period of time after Mr. Hare's testimony in front of the grand jury. Similarly, Chief Zitek did not request Mr. Hare's removal from the Commander position until 2001, and he did not seek to have Mr. Hare's license terminated until 2001. While the temporal link between the grand jury testimony may not be dispositive, *Smith v. Dunn*, 368 F.3d 705, 709 (7th Cir. 2004), it does tend to undermine the defendants' arguments on this score.

And there is more. For example, after his shifts were changed, Mr. Hare wrote several letters to Chief Zitek asking to be returned to his regular shift and stating that he would assume that Chief Zitek was retaliating against him for his grand jury

testimony unless he received a different response. (Mr. Hare's letters: Plaintiff's Exhibits 33, 37, 38, 41). Chief Zitek never replied to these letters. Officer Kretch testified, that after the grand jury testimony, Sergeant Wiseman told him that "shifts are going to change and heads are going to roll," which Officer Kertch understood to mean that Chief Zitek was going to make these changes. (Kretch Dep. pp. 58-59). Additionally, David Schmidt, an independent contractor for the Village and a friend of Mr. Hare, testified that, after questioning Mr. Schmidt about his knowledge of the SAO investigation, the Chief and the Mayor told him, in November 2000, that, if he knew what was good for him, he would stop associating with Mr. Hare. (Schmidt, Dep. pp. 8, 20-22).

Although a jury could accept Chief Zitek's contention that he changed Mr. Hare's duties and took these other actions because of the Heather Hanlon incident in July 2000, it could just as easily find that the Chief took these steps because of Mr. Hare's involvement in the SAO investigation in late 2000.

The defendants also argue that there is no indication that Mayor Tabor took any adverse action against Mr. Hare. However, evidence in the record suggests that Mayor Tabor was the person who arranged for legal representation for officers who testified in front of the grand jury, and that he offered such

representation to everyone but Mr. Hare. Additionally, given his status as Mayor, a jury could reasonably conclude that Mayor Tabor authorized, or at least knew about and went along with, the Village attorney's conduct in the Pension Board hearing, and that he may have had a hand in recruiting the new candidates for the Pension Board elections to reconsider Mr. Hare's duty disability pension award.

Under these facts, a reasonable jury could conclude that Mr. Hare did, in fact, suffer one or more adverse employment actions at the defendants' hands, and that the defendants took such action because of Mr. Hare's cooperation with the SAO and his testimony in front of the grand jury.

      c.    Would the Defendants Have Taken the Same
              Action Absent Mr. Hare's Exercise of Speech?

In the final step of the First Amendment retaliation analysis, the Court considers whether the defendants can demonstrate that they would have taken the same action absent the protected speech. With respect to this element, the defendants argue only that any action suffered by Mr. Hare was the result of the Heather Hanlon incident, and, as such, the action would have been taken even if Mr. Hare had not participated in the corruption investigation. They argue that, because of the Heather Hanlon incident, Chief Zitek had the power to file formal

59

disciplinary charges against Mr. Hare, and that as an "act of kindness," Chief Zitek opted instead to change Mr. Hare's shift, so that he could avoid having to interact with him.

Although the defendants' argument is perhaps plausible, their story is somewhat problematic because of the timing of the events. The defendants do not explain, for example, why Chief Zitek would have waited almost five months after the incident to reassign Mr. Hare and remove his work car and pager, and more than a year after the incident to request termination of Mr. Hare's firearm license. Nor do they explain why the Chief started an unwarranted criminal investigation against Mr. Hare. Nor do they explain the Village's failure to provide legal representation to Mr. Hare during his grand jury testimony or the Village's attempts to interfere with the Pension Board proceedings and elections.

In sum, based on the evidence, a reasonable jury could conclude that the alleged adverse employment actions were not connected with the Heather Hanlon incident, and that the defendants would not have taken the same actions had Mr. Hare not cooperated with the SAO and had he not testified before the grand jury.

2. Mr. Hare's Municipal Liability Claim

The defendants argue that, even if Mr. Hare can establish a

60

*prima facie* case for retaliation, he still fails to show that the Village is liable. The Village of Stickney can be held liable for violations of §1983 only if it is the municipality's policy or custom that caused the injury. *Monell v. New York Department of Social Services*, 436 U.S. 658, 690-691 (1978). There are three ways to establish municipal policy: (1) an "express policy" that causes a constitutional deprivation; (2) a widespread practice that constitutes a "custom or usage;" or (3) a constitutional injury cause or ratified by a person with final decision making authority. *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 494 (7th Cir. 2002). Mr. Hare claims that the Village is liable under the second and third prongs of the test, while the defendants contend that the evidence in the record is insufficient to support either.

### a.   Widespread Practice of Retaliation

Mr. Hare first argues that he sustained his burden under *Monell*, because he presented sufficient evidence that the Village had a widespread practice of retaliation against "whistleblowers." The widespread practice must be so well settled as to constitute custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Random acts or isolated incidents are insufficient to establish a widespread practice. *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir.

61

2002). A series of violations must be presented to establish a widespread practice. *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003). For example, there is no widespread practice of erroneous information, where out of 181,911 vehicles towed to a certain lot over the period of four years, only three car owners were falsely informed that their vehicles were not on the lot. *Id.*

In an effort to show that the Village's retaliation was inflicted consistent with the Village's widespread practice of retaliation, Mr. Hare has presented testimony from numerous Stickney Police officers, who cooperated with the SAO. These officers all testified that they were passed over for promotions, reprimanded, or terminated as a result of their cooperation. This testimony is sufficient to establish a series of violations and create a factual dispute on the issue of whether the Village had a widespread practice of retaliation against those who spoke against the alleged Village corruption.

b. Injury Caused by Final Decisionmakers

Mr. Hare has also argues that Chief Zitek and Mayor Tabor had final decision making authority and used it to retaliate against him. To prove this element of his municipal liability claim Mr. Hare must show that the decision to adopt a particular course of action, which caused his injury, was made by the

government's officers who "possess final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986). It does not matter what form of the action the final authority uses, it can be an ordinance, a regulation, an executive policy, or an executive act. *Gernetzke v. Kenosha Unified School District,* 274 F.3d 464, 468 (7th Cir. 2001). What matters is whether the actor, the decisionmaker, "was at the apex of authority for the act in question." *Id.* To determine whether a person possesses final authority for §1983 purposes, courts look to the local law, as well as custom or usage having the force of law. *Cornfield v. Consolidated High Sch. Dist. No. 230,* 991 F.2d 1316, 1325 (7th Cir. 1993).

The Rules and Regulations of the Stickney Police Department authorize the Chief of Police to "manage and control all matters pertaining to the Police Department" and to "promulgate all Rules and Regulations and orders of the Department." (Plaintiff's Exhibit 10 - Rules and Regulations of Stickney Police Department: Chief of Police). Chief Zitek, as well as Mayor Tabor and Trustee Dolezal, admitted that the Chief had the authority to reassign Mr. Hare and change his duties or shifts without consulting the Village Board. Similarly, Chief Zitek could and did make the decision to start a criminal investigation against

63

Mr. Hare in regards to Ms. Koudelka without authorization from the Village Board. Therefore, there is sufficient evidence in the record to show that Chief Zitek had final decision making authority with respect to at least some of the alleged retaliatory acts.

### 3.   Mr. Hare's Conspiracy claim

Count 2 of Mr. Hare's complaint alleges conspiracy to violate his First Amendment rights. To establish a *prima facie* case for his civil conspiracy claim, Mr. Hare must show "(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988).

The defendants seek summary judgment on this claim, arguing that the record contains no evidence of any agreement – express or implied; they also argue that Mr. Hare was not deprived of any right.  Not surprisingly, Mr. Hare disagrees.

As evidence of an agreement, Mr. Hare has offered the testimony of Ms. Stratton.  Ms. Stratton testified that, when she went to interview Ms. Madsen, she was confronted by both Mayor Tabor and Chief Zitek, who pushed for information and told her that they knew about the investigation and demanded that they had

the right to know what she was doing. Mr. Hare also points to the fact that both defendants were present together at other meetings at which the issue was discussed.

Beyond this, the record also suggests that both defendants knew the identities of the officers who were cooperating with the SAO at the early stages of the investigation. And both Chief Zitek and Mayor Tabor contacted police officers who were to testify before the grand jury to offer them the assistance of the Village attorney, yet neither defendant contacted Mr. Hare. Additionally, some evidence suggests that Chief Zitek pursued further actions against Mr. Hare right after Mayor Tabor was re-elected to his position. A reasonable jury, based on these facts, could find that Chief Zitek and Mayor Tabor had an agreement, express or implied, to take adverse employment actions against Mr. Hare because of his cooperation with the SAO. Indeed, as discussed above, Mr. Hare presented sufficient evidence showing that he suffered an adverse employment action and he has presented sufficient evidence that Chief Zitek and Mayor Tabor caused that action.

## Conclusion

For the reasons stated above, the Court denies defendants' motions to strike Mr. Hare's affidavit [#104] and Mr. Hare's additional statements of facts [#102], grants in part the

65

defendants' motion to strike Mr. Hare's responses to the
defendants' statement of facts [#103], and denies the defendants'
motion for summary judgment [#85].

Dated: December 15, 2005

ENTER:

Arlander Keys

ARLANDER KEYS
United States Magistrate Judge