IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RICHEY A. HARE, SR. | ) | |
| | ) | |
| Plaintiff, | ) | No. 02 C 3973 |
| | ) | |
| vs. | ) | |
| | ) | |
| JOHN ZITEK, individually and in his official capacity as Chief of Police of the Stickney Police Department, DONALD TABOR, individually and in his official capacity as President of the Village of Stickney, and THE VILLAGE OF STICKNEY, a municipal corporation, | ) ) ) ) ) ) ) ) ) ) | Magistrate Judge Arlander Keys |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Richey Hare joined the Stickney Police Department in 1986. In 2002, he sued the department, as well as the Village of Stickney, Stickney's Chief of Police (John Zitek), and Stickney's Mayor (Donald Tabor), alleging that these defendants retaliated against him because he uncovered and exposed corruption within the Police Department and within the Village. Specifically, he claims that the defendants harassed and intimidated him, going so far as to attempt to trump up a sexual assault case against him, all in violation of 42 U.S.C. §1983, and in furtherance of a conspiracy to violate 42 U.S.C. §1983.

The case was tried to a jury beginning August 7, 2006. Mr. Hare testified, as did Chief Zitek and Mayor Tabor. In addition,

the parties presented testimony from several of Mr. Hare's former colleagues at the Stickney Police Department; from Karyn Stratton, the Assistant State's Attorney who handled the investigation into the whistle-blowers' allegations; Trustee Dolezal; Kimberly Koudelka, the woman who Chief Zitek allegedly tried to persuade to trump up charges against Mr. Hare; Ms. Koudelka's mother; the detective who investigated the Koudelka matter for Chief Zitek; and Susan Locander, a former freelance reporter who covered the story surrounding the police officers' concerns about possible corruption in the Stickney Police Department. The jury also heard from Mr. Hare's treating psychiatrist.

At the close of the evidence, all three defendants moved for judgment as a matter of law, though counsel for Chief Zitek acknowledged that, when viewed in the light most favorable to Mr. Hare, the evidence likely required that the motion be denied as to his client. The Court agreed and denied the motion with regard to Chief Zitek. The Court also found that the claim against the Village should go to the jury, and so it denied the Village's motion as well. With regard to Mayor Tabor, the Court noted that the question was "very close" and that the evidence against Mayor Tabor was "rather flimsy." But, given the evidence that the mayor may have called some officers to offer them legal representation but did not call Mr. Hare, the Court determined

that the claim against the mayor should be decided by the jury.

In the end, on August 14, 2006, the jury returned a verdict in Mr. Hare's favor, awarding him $1,767,497.56 in compensatory damages and $2 million in punitive damages - one million each against the Chief and the mayor. The Court entered judgment reflecting the verdict that same day.

On August 28, 2006, Mayor Tabor and the Village renewed their motions for judgment as a matter of law. The defendants also filed three additional post-trial motions: the mayor and the Chief filed separate motions to strike the punitive damages awards against them, and the Village filed a motion for a new trial on damages or remittitur. On November 7, 2006, the Court stayed execution of the judgment pending resolution of these motions. The Court now considers each motion in turn.

A. <u>Mayor Tabor's Post-Trial Motions</u>

As explained, at the close of the evidence, Mayor Tabor moved for judgment as a matter of law, and, although the question was close and the evidence flimsy, the Court denied the motion at that time. Mayor Tabor has now renewed his motion, asking the Court to grant him judgment as a matter of law under Rule 50(b), which is appropriate only if the jury lacked a "legally sufficient evidentiary basis for its verdict." *Filipovich v. K&R Express Systems, Inc.*, 391 F.3d 859, 863(7th Cir. 2004)(citing *Massey v. Blue Cross-Blue Shield of Illinois*, 226 F.3d 922, 924

(7th Cir. 2000)). "A legally sufficient amount of evidence need not be overwhelming, but it must be more than a 'mere scintilla.'" *Id.* (quoting *Massey*, 226 F.3d at 924). In assessing the basis for the verdict, the Court examines the evidence presented to the jury in the light most favorable to the party against whom the motion is directed. *See, e.g., Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001); *Cygnar v. City of Chicago*, 865 F.2d 827, 834 (7th Cir. 1989)(citing *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1213 (7th Cir. 1985)).

In support of his motion, the mayor argues that there was simply no evidence adduced at trial to support the verdict against him; no witness ever testified that he retaliated against Mr. Hare; no document established any retaliation on the part of the mayor. He argues that the jury must have found him liable simply because he is the mayor. Mr. Hare disagrees. He argues that the evidence adduced at trial supported Mr. Hare's claim that Mayor Tabor retaliated against him by not offering him legal representation for his grand jury appearance and by authorizing the Village attorney to attempt to interfere in Mr. Hare's pension hearing.

With regard to the failure to provide legal representation for the grand jury appearances, Mayor Tabor testified that he wrote a memorandum dated November 1, 2000 advising that the Village would retain counsel for employees called before the

4

grand jury. *See* Trial Transcript, Vol. 3B, p. 18. Mayor Tabor testified that he may have called witnesses to tell them they could have an attorney, but he did not recall; he said he may have simply posted the memo advising of that policy. *Id.*, p. 19. In either case, he admitted that he did not call Mr. Hare to offer him an attorney. *Id.*, p. 20. He testified that Mr. Hare never told him he had been subpoenaed, and that he never asked him for legal representation. *Id.*, p. 51.

The jury also heard from two other officers who were subpoenaed to appear before the grand jury in connection with Karyn Stratton's investigation at or about the same time Mr. Hare was subpoenaed. These officers, Robert Fox and Mark Kozelka, testified that, after they were subpoenaed, the mayor called them to tell them that the Village would provide an attorney if they wanted one. *See* Trial Transcript, Vol. 3B, p. 83-84 (Officer Fox); p. 97 (Officer Kozelka).

Even when viewed in the light most favorable to Mr. Hare, however, this evidence would establish only that some subpoenaed officers were called, while Mr. Hare was not. The mayor's failure to call Mr. Hare can support a retaliation claim only if the evidence would allow the jury to attach some retaliatory motive to that failure. *See, e.g., Cygan v. Wisconsin Department of Corrections*, 388 F.3d 1092, 1098 (7th Cir. 2004)(to prevail on a First Amendment retaliation claim, plaintiff must show that he

5

suffered some adverse employment action and that his speech was a substantial motivating factor for that action). And, quite simply, there was no evidence to support such a motive here.

With respect to both Officers Fox and Kozelka, the evidence showed that the mayor knew that these two officers either had been subpoenaed or were likely to be subpoenaed. Officer Kozelka testified that his subpoena arrived at the police station, and the Chief and the mayor actually knew about it before he did; he testified that the mayor told him there was a subpoena there waiting for him and that the Village would provide an attorney to accompany him if he so desired. *Id.*, p. 97. And Officer Fox testified that the mayor called him before he even received a subpoena; he testified that the mayor told him that "something was brewing," that he "may or may not be receiving a Grand Jury subpoena," but that, if he did, the Village "had an attorney for me if I wanted one." Trial Transcript, Vol. 3B, p. 83.

In Mr. Hare's case, there is simply no evidence that Mayor Tabor knew that he was likely to receive, or that he had received, a subpoena. No one testified that Mr. Hare's subpoena came to the station; no one testified that Mayor Tabor knew, on or before October 30, 2000, that Richey Hare was going to appear before the grand jury and might be in need of an attorney. Mr. Hare testified that he knew exactly when he was going to be served with the grand jury subpoena, that he testified on a

Monday morning and was out of the office and out of town for the 3 days immediately preceding his testimony. He also admitted that he never told the mayor or the chief that he had been subpoenaed and he never asked for an attorney. Trial Transcript, Vol. 4B, p. 162. In short, there is simply no evidence to support his claim that the mayor failed to offer him legal representation in retaliation for anything, let alone in retaliation for Mr. Hare's exercise of his First Amendment rights.

Indeed, there is no evidence that the mayor even knew, at least at that point in time, that Mr. Hare was a whistle blower. Mr. Hare testified that he discussed his concerns with Trustee Dolezal and that he assumed Mr. Dolezal had passed on his concerns to the mayor. But he also admitted that he went to Mr. Dolezal in the first place because he thought Mr. Dolezal would keep quiet about his involvement in the matter. Trial Transcript, Vol. 4B, pp. 149-150. And Trustee Dolezal testified that, although he passed along the concerns shared by Mr. Hare, he did not reveal Mr. Hare's name to the mayor. Trial Transcript, Vol. 3B, p. 64. With regard to the pension hearing, the evidence established that Donald Kreger acted as the Village Attorney and that he appeared at Mr. Hare's pension board hearing, ostensibly on behalf of the Village, to contest Mr. Hare's claim for a line-of-duty disability pension. The evidence

established that the Village never sought to deny Mr. Hare a pension outright; rather, the evidence showed that the Village sought to have Mr. Hare awarded a straight disability pension. The difference between the two is that, with a line-of-duty disability pension, the officer receives 65% of his pay (15% more than he would receive if the disability were not in the line-of-duty) and the benefits would be awarded on a tax-free basis, which was not true of non-line-of-duty disability benefits. The evidence also established that Mr. Kreger was the Village attorney and that he generally acted at the behest of either the Village Trustees or the mayor.

But the evidence also established that Mayor Tabor did not authorize Mr. Kreger to appear at the pension hearing to challenge Mr. Hare's line-of-duty disability pension. Mayor Tabor testified as much; he also testified that, to his knowledge, the Village Board never authorized Mr. Kreger to appear at the pension meeting. Quite simply, there was no evidence to the contrary.

The Court denied the defendants' summary judgment motion regarding Mr. Hare's claim against Mayor Tabor because it determined that the evidence - notably, Ms. Stratton's deposition testimony that Mayor Tabor and Chief Zitek both pressed her for information about her investigation when she ran into them at the police station on October 18, 2000, evidence that the mayor and

8

the chief both knew, early on, who the whistle-blowing cops were, evidence that the mayor and the Chief both contacted police officers who were called to testify before the grand jury, yet neither called Mr. Hare – would be enough to give a reasonable jury cause to find them liable. But, at trial, this evidence was not borne out in the way that Mr. Hare had represented, at the summary judgment stage, that it would be. For example, at trial, Karyn Stratton testified that, when she ran into the Chief and mayor on October 18th, she never mentioned any whistle-blowers' name and they never gave any indication that they knew what the investigation was really about; on the contrary, according to both the Chief and Ms. Stratton, the Chief indicated that he thought the investigation had something to do with the Hawthorne Racetrack, not with allegations that he was stealing money from the till. And nothing Ms. Stratton said at trial suggested that the mayor ever even knew that Mr. Hare was involved in her investigation.

When pressed to explain why, exactly, he thought Mayor Tabor should be liable, Mr. Hare testified as follows:

> Q: What did the Mayor do? What did the Mayor do, physically do, or tell anyone that hurt you?
>
> A: You know, I can't – nothing comes to mind right now, but there were a number of things.

Trial Transcript, Vol. 4B, p. 133. Tellingly, after years of discovery and personal investment in this lawsuit, at his shining

moment - his trial - Mr. Hare was unable to articulate any factual basis for imposing liability on Mayor Tabor. The best he could offer the jury was that the mayor "was right alongside with [Zitek]. He agreed with him." *Id.*, p. 133. But, in terms of the actions Chief Zitek took - changing Mr. Hare's shifts and taking away his duties, trying to trump up charges against him in connection with the Kim Koudelka incident, etc. - the evidence was clear that the mayor was not involved in any of those actions.

In the final analysis, the Court finds that, at best, the jury's verdict against Mayor Tabor was supported by no more than "a mere scintilla of evidence"; the verdict as to the mayor must, therefore, be overturned, and the Court will grant the mayor's renewed motion for judgment as a matter of law.

In addition to his renewed Rule 50 motion, Mayor Tabor filed a motion, under Federal Rule of Civil Procedure 59, to strike the punitive damages award against him. In light of the Court's ruling on Mayor Tabor's motion for judgment as a matter of law, the Court will grant the motion to strike the punitive damages award. Punitive damages are recoverable under § 1983 even in the absence of actual damages if the defendant's conduct was "motivated by evil intent or involv[ed] reckless or callous indifference to the federally-protected rights of others." *Siebert v. Severino*, 256 F.3d 648, 655 (7th Cir. 2001)(internal

citations omitted). But, at least with respect to Mayor Tabor, there was no evidence of evil intent or reckless or callous indifference. Accordingly, the punitive damages award against Mayor Tabor is stricken.

B. The Village's Post-Trial Motions

Like Mayor Tabor, the Village of Stickney renewed its Rule 50 motion after the jury returned its verdict. The Village argues that it cannot be liable under §1983 simply because the Chief and the mayor are Village officials; rather, the Village argues, it can only be on the hook if Mr. Hare proved that they were final policymakers, and, according to the Village, he failed to meet that burden. Having determined that the evidence did not support a claim against Mayor Tabor, the Court will limit its discussion in this regard to Chief Zitek.

With regard to the revocation of Mr. Hare's FOID card, the Court agrees that final decision-making authority for FOID cards rested, not with Chief Zitek, but with the Illinois State Police. Mr. Hare admitted as much at trial. See Trial Transcript, Vol. 4B, p. 132. Thus, if this were the only act of retaliation, the Court would be inclined to grant the Village's motion. But this wasn't the only act of retaliation.

Beyond the FOID card issue, Mr. Hare testified that, in his view, the Chief's decision to change his shift, to take away the bulk of his responsibilities, his car, his overtime work, etc.

was retaliatory. And the evidence was clear that, with respect to these decisions, Chief Zitek was the "final" decision maker in the "special sense that there is no higher authority." *Rasche v. Village of Beecher*, 336 F.3d 588, 600 (7th Cir. 2003). On the stand, the Chief admitted that the decision to remove Mr. Hare from his commander duties and to move him back down to the uniformed patrol division was his decision and his alone; he testified that he did not need approval from the mayor or the Village Board or the Trustees to take this action. Trial Transcript, Vol. 3A, p. 33. He testified that the same was true with respect to the decision to take away Mr. Hare's department-issued car and the decision to change Mr. Hare's shift such that he no longer had weekends off, *id.*, p. 65 – both actions that Mr. Hare claimed were retaliatory. Mayor Tabor confirmed that decisions concerning the reorganization of officers' shifts and assignments would have been Chief Zitek's and Chief Zitek's alone. *See* Trial Transcript, Vol. 3B, p. 31. From this evidence, the jury could reasonably have concluded that, at least with regard to some of the alleged retaliatory acts, Chief Zitek was the final decision-maker on those issues, and the Village should therefore be held accountable.

In short, the jury's determination that the Village should be held liable for the actions of Chief Zitek was supported by ample evidence. The Village's motion for judgment as a matter of

law is denied.

The Village also filed a motion seeking a new trial on damages; according to the Village, the jury's compensatory damages award was "monstrously excessive" and had "no rational connection" to the evidence. See Defendant Village of Stickney's Post-Trial Motion for a New Trial on Damages or Remittitur, p. 1. The Court disagrees on both counts.

"In determining whether an award is excessive, substantial deference should be given to the decision of the jury and the jury's award should not be disturbed unless it is 'monstrously excessive' or "so large as to shock the conscience of the court." Morales v. Cadena, 825 F.2d 1095, 1100 (7th Cir. 1987)(quoting Marybeth G. v. City of Chicago, 723 F.2d 1263, 1275 (7th Cir. 1983).

At trial, the jury heard evidence that Chief Zitek essentially stripped Mr. Hare of his duties, took away the only job he had ever really wanted to do, sent him so far off the deep end that he cannot work again as a police officer, and attempted to ruin his reputation in the community he called home by trumping up charges against him. Additionally, the jury heard (via deposition) the testimony of Mr. Hare's doctor, Dr. Tahir Sheikh, who has treated Mr. Hare since May of 2001; Dr. Sheikh testified that Mr. Hare has a major depressive disorder and post-traumatic stress disorder and is "significantly impaired and

unable to function in his day-to-day life, including his job."
See Plaintiff's Exhibit 41, p. 36. In his closing argument, counsel for Mr. Hare asked the jury to award him compensatory damages as follows: $257,787.88 to cover pre-trial wage losses; $5,371 to cover medical expenses; $216 to cover prescription drug expenses; $645,150.80 to cover future wage losses; and $1 million to cover Mr. Hare's emotional pain and suffering. The jury awarded $1,767,497.56, less than what was requested. Given the evidence described above – which was unrebutted – the Court will defer to the decision of the jury, and decline to remit the damage award; the award was rationally connected to the evidence, and, given the evidence, was not "monstrously excessive."

C. <u>Chief Zitek's Motion to Strike the Punitive Damages Award</u>

Chief Zitek, unlike Mayor Tabor, did not renew his motion for judgment as a matter of law. He has, however, asked the Court to strike (or reduce) the punitive damages award entered against him. As noted above, the jury awarded Mr. Hare $1,767,497.56 in compensatory damages, which is 93% of what he requested. Presumably, Mr. Hare has been made whole by the award of compensatory damages. Generally, punitive damages should be limited to an amount necessary to deter and punish; an award will be reduced only when it clearly exceeds an amount necessary to serve these goals. *E.g., BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575-581 (1996); *Merriweather v. Family Dollar Stores of*

14

*Indiana, Inc.*, 103 F.3d 576, 581 (7th Cir. 1996). There is no question that the amount awarded here is within the proportional limits suggested by the jurisprudence - BMW suggests that a 4 to 1 ratio would pass muster, *see* 517 U.S. at 580-81, and the award here was not even 1 to 1. Nevertheless, the Court is persuaded that a substantial reduction is appropriate, given that the compensatory damages award was relatively large. *See Gavin v. AT&T Corp.*, 464 F.3d 634, 641 (7th Cir. 2006)(suggesting that, in assessing the award's effectiveness in achieving the goals of deterrence and punishment, the court should look at the total award package, not just the punitive damages award).

In his motion, Chief Zitek argues that any punitive damages award should be in the area of $50,000 or less, and he suggests that, in fixing an amount, the Court should be guided by *Niebur v. Town of Cicero*, 212 F.Supp. 2d 790 (N.D. Ill. 2002). In *Niebur*, the plaintiffs were suspended and ultimately fired because of their work in exposing corruption within the town of Cicero; they sued under §1983, alleging various constitutional causes of action, including violation of their First Amendment rights and retaliatory discharge, and a jury awarded each plaintiff in the neighborhood of $1 million in compensatory damages (including emotional damages) and $75,000 in punitive damages ($50,000 against one defendant, and $25,000 against the other). *Id.* at 799-800, 821.

Frankly, the conduct in *Niebur*, though egregious, would seem to be much less so than that at issue here - here, the jury heard evidence that, in addition to stripping Mr. Hare of his professional responsibilities, Chief Zitek attempted to destroy his reputation and even attempted to have him prosecuted criminally. This evidence would justify a higher award than those imposed in *Niebur*.

In the end, the Court is persuaded that a punitive damages award of $90,000--roughly 5% of the compensatory damages award-- will serve to both punish Chief Zitek's conduct and to deter any future misconduct. Although the defendants introduced very little evidence on the point, the Court understands that Chief Zitek is not a particularly wealthy man; he has been a public servant his entire career, making just $90,000 per year currently, and he is nearing retirement, when he will have to live on a fixed income. The payment of one year's salary to Mr. Hare should suffice. The object of punitive damages is not to ruin the defendant, but merely to punish him. *See, e.g., Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1143 (7th Cir. 1987)(citing *Hazelwood v. Illinois Central Gulf Railroad*, 114 Ill. App. 3d 703, 711 (1983)). In the Court's view, the award, as reduced, serves to achieve this end. Contrary to Mr. Hare's contention, a $1 million award would destroy most individuals, and it would most certainly destroy Chief Zitek.

Conclusion

For the reasons explained above, Mayor Tabor's Motion for Judgment as a Matter of Law [#192] and his Motion to Strike the Punitive Damages Award [#196] are granted; the Village of Stickney's Motion for Judgment as a Matter of Law [#191] and Motion for a New Trial on Damages [#194] are denied; and Chief Zitek's Motion to Strike the Punitive Damages Award and, in the Alternative for Remittitur of the Award [#197] is granted. The judgment against Mayor Tabor is vacated, and the punitive damages awarded against him are stricken; the punitive damages awarded against Chief Zitek are reduced to $90,000. The amount of the compensatory damages award, $1,767,497.56, remains unchanged.

Date: December 28, 2006

ENTER:

*[signature: Arlander Keys]*

ARLANDER KEYS
United States Magistrate Judge